IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**THOMAS J. PHILLIPS,**                      Case No. 3:16 CV 514

     Plaintiff,

     v.                                      Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

     Defendant.                              MEMORANDUM OPINION AND ORDER

### INTRODUCTION

Plaintiff Thomas J. Phillips ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. § 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 13). For the reasons stated below, the undersigned reverses the decision of the Commissioner and remands for further proceedings.

### PROCEDURAL BACKGROUND

Plaintiff filed for SSI in November 2011, alleging a disability onset date of March 30, 2011. (Tr. 181-86). His claims were denied initially and upon reconsideration. (Tr. 110-12; 117-20). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 123-24). Plaintiff (represented by counsel) and a vocational expert ("VE") testified at a hearing before the ALJ on April 8, 2014. (Tr. 35-75). On August 18, 2014, the ALJ found Plaintiff not disabled in a written decision. (Tr. 19-29). The Appeals Council denied Plaintiff's request for review, making

the hearing decision the final decision of the Commissioner. (Tr. 1-6); 20 C.F.R. §§ 404.955, 404.981. Plaintiff filed the instant action on March 3, 2016. (Doc. 1).

## FACTUAL BACKGROUND

### Personal Background and Testimony

Plaintiff testified at the April 2014 hearing that he was 48 years old and had dropped out of school in the ninth grade. (Tr. 41). He rented a room in a house with a shared kitchen (Tr. 42) and does his own cleaning, laundry, self-care, and cooking (Tr. 43, 49). He does not do any gardening, yard work, or mowing. (Tr. 44).

Plaintiff testified he became disabled in March 2011 (Tr. 41), and believed he could not work because he did not think he could "keep up with the people" or think of "what job [he would] have to do [where he would not] have to slow down and take a break" (Tr. 49). When he tries to do something quickly, he gets out of breath. *Id.* Humidity, cold, and dust makes his breathing difficulty worse. (Tr. 55-56). He can do fifteen to twenty minutes of raking (with oxygen on). (Tr. 55). He can walk about three blocks, then stop for a "couple deep breaths", and can walk about six blocks altogether. (Tr. 57). He has to stop walking both because of his breathing and his knees. (Tr. 58). After exercise, he "uses his oxygen for about five to ten minutes, and then he's "back being fine." *Id.* He breaks up his household chores, doing a little at a time (fifteen to twenty minute increments), and taking breaks to sit down. (Tr. 61-62). Plaintiff quit smoking one month before the hearing, and was using an electronic cigarette. (Tr. 47-48).

Plaintiff testified he uses a CPAP machine at night for obstructive sleep apnea and feels better rested as a result. (Tr. 51-52). He uses oxygen at night. (Tr. 52). He also uses oxygen during the day when he overexerts himself like when "try[ing] to take a long walk, or try[ing] to lift something that's a little heavy." *Id.* He tries to use his inhaler first, but if that does not work,

2

he uses the oxygen for about ten minutes approximately twice per day. (Tr. 52-53). He brings his oxygen with him when he goes out. (Tr. 53) ("I carry it in a buddy's trunk or whoever takes me, I take it just in case I need it there.").

On a typical day, Plaintiff gets up, watches the news, "tr[ies] to go for a little walk, and then [he] tr[ies] to get some exercise in." *Id.* After that he comes home, and sits with his leg propped up, and watches television. *Id.* His mother and son visit him, and his son or niece take him to the grocery store. (Tr. 44). At the grocery store, he is able to walk "because usually it's just for a few items" and he can hold on to the cart. (Tr. 53). He testified that he lays on his stomach to rest during the day because laying on his back for too long hurts. (Tr. 59).

Plaintiff testified he had left knee surgery, and was waiting for his knee to "heal enough to support [his] weigh[t]" before having the other knee done. (Tr. 50). He still has left knee pain when he overdoes it, but "not as bad as it was." (Tr. 54). His right knee still hurts and he avoids doing too many stairs, and kneeling hurts. (Tr. 54-55). His knee mainly causes trouble with walking (Tr. 57). He also elevates his leg to waist high to relieve some of the pressure on his back and legs. (Tr. 60).

Plaintiff also has back pain when twisting or sitting, and testified he is developing arthritis. (Tr. 56). It is not constant pain, but only if he sits too long without moving. *Id.* He testified he could sit still for fifteen to twenty minutes, but if he can shift his weight around, he can sit for an hour at most. (Tr. 57). When asked if he could sit for an hour, then get up and stretch, then go back to sitting for an hour, he testified he could. (Tr. 58). When asked if he could do that throughout the day, he responded that "[i]t'd be [a] tough call." *Id.*

Plaintiff estimated he could stand for a couple of hours if he was able to walk a little, but if he had to stand in one place, only shifting weight from foot to foot, about fifteen minutes. (Tr.

3

61). This limitation was due to the pain in his knees. *Id*. Plaintiff also estimated he could lift ten to fifteen pounds occasionally, "but if I'm going to have to do it every five minutes I couldn't do it." (Tr. 62).

***Relevant Medical Evidence***[1]

*Chronic Obstructive Pulmonary Disease ("COPD")*

In April 2011, Plaintiff was hospitalized at Paulding County Hospital for two nights for anemia and COPD. (Tr. 277-79). His admission notes indicate that he has smoked one and a half packs of cigarettes per day for the past 20 years. (Tr. 277). A chest x-ray showed "subsegmental atelectasis and a probable small posterior right pleural effusion." (Tr. 279). At the time of discharge, he was "[m]oving good air" and "denied any wheezing." *Id.*

In November 2011, the interviewer assisting Plaintiff in completing his application observed that Plaintiff "seemed to have a difficult time talking and breathing and would have to stop at certain points when answering questions." (Tr. 203).

In February 2012, Plaintiff was again hospitalized for shortness of breath. (Tr. 445-47). He was again diagnosed with anemia and COPD exacerbation, as well as gastroesophageal reflux disease. (Tr. 445).

Early in May 2012, Plaintiff presented to the ER complaining of shortness of breath. (Tr. 544-45). A May 16, 2012 chest x-ray showed a new "ill-defined right basilar infiltrate" which "may represent pneumonitis" and a"[r]etrocardiac density in the midline." (Tr. 522). A May 25, 2012 chest x-ray showed low lung volumes, but was otherwise negative. (Tr. 543).

---

1. The undersigned here summarizes only the medical evidence related to the errors Plaintiff raises. *See Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) (issues not raised in claimant's brief waived).

4

Pulmonary function studies performed in June 2012 showed Plaintiff had a "moderate obstruction." (Tr. 403). A physician's note in July 2012 indicates Plaintiff "is wearing his CPAP but only for about 4 hours a night." (Tr. 784).

Plaintiff began treating with Zohar Vasi, M.D. in August 2012. (Tr. 684-85). Dr. Vasi noted Plaintiff was "very hoarse" and had "wheezing in the lungs." (Tr. 685). His history indicated he smoked one-half pack per day, and prior to that he smoked four packs a day for five years (and had smoked for 26 years total). (Tr. 684). Dr. Vasi assessed Plaintiff with COPD. (Tr. 685). Pulmonary function studies performed in October 2012 showed "[m]oderate impairment of gas exchange." (Tr. 615).

Plaintiff saw Dr. Vasi twice in November 2012 for breathing issues. Dr. Vasi noted a decrease in breath sounds and rhonchi. (Tr. 690, 692). He assessed Plaintiff with pharyngitis and chronic bronchitis (Tr. 690), as well as acute bronchitis and COPD (Tr. 693) and ordered a chest x-ray (Tr. 693).

Pulmonary function studies in January 2013 revealed "[m]ild obstructive airway disease without significant reversibility" and "[m]ild impairment of gas exchange." (Tr. 629). The physician noted this was" consistent with the patient's smoking history." *Id.*

Plaintiff continued to treat with Dr. Vasi in 2013 for various conditions. *See* Tr. 694-724, 756-58, 760-62. Regarding Plaintiff's breathing, Dr. Vasi regularly noted decreased breath sounds and wheezing (Tr. 696, 703, 705, 708, 711, 714, 717, 720, 724, 758, 762), as well as abnormal voice sounds (Tr. 705, 714), rales and crackles bilaterally (Tr. 711), and some basilar rales (Tr. 699). Dr. Vasi diagnosed (among other things) chronic sinusitis, allergic rhinitis, acute bronchitis, acute laryngitis, and COPD. *See* Tr. 696, 698, 703, 711, 714, 717, 720, 724, 758.

5

In December 2013, Dr. Vasi again noted decreased breath sounds, as well as a bruit in the carotid artery. (Tr. 766). He was again assessed with allergic rhinitis and COPD. *Id*. Also in December 2013, Dr. Vasi prescribed home oxygen due to COPD, shortness of breath, and obstructive sleep apnea. (Tr. 763). He noted Plaintiff's qualifying test was an oxygen saturation level of 88% on room air in October 2013. *Id*. Dr. Vasi noted Plaintiff would need the oxygen at night and the "length of need" was "lifetime". *Id*.

In January and February 2014, Dr. Vasi again noted a decrease in breath sounds (Tr. 771, 775) and, in January 2014, wheezing on expiration (Tr. 771).

*Knee Problems and Back Pain*

In 2012, Plaintiff made several visits to the hospital for knee pain after a fall. *See* Tr. 522, 600-04, 605-09. A May 2012 x-ray of Plaintiff's left knee indicated moderate joint space narrowing, no acute bony abnormality, abnormal soft tissue swelling and suprapatellar joint effusion. (Tr. 522). A nurse's exam during a July 2012 emergency room visit revealed swelling and tenderness. (Tr. 600). The doctor's impression was "left knee sprain." (Tr. 604). Plaintiff returned to the emergency room in August 2012 due to left knee pain. (Tr. 605). The doctor's impression was left knee pain, and he was discharged with Vicodin. (Tr. 609).

At Plaintiff's first visit with Dr. Vasi in August 2012, Plaintiff complained of knee joint pain, swelling, and stiffness. (Tr. 684). Dr. Vasi noted bilateral effusion of the knees, prepatellar swelling and infrapatellar swelling. (Tr. 685). Knee flexion and extension were both abnormal and Plaintiff had pain with motion. *Id*. Plaintiff's left knee was tender to palpation. *Id*. Dr. Vasi referred Plaintiff to an orthopedic surgeon after assessing knee joint pain and knee sprain. *Id*. Dr. Vasi noted similar findings in September 2012. (Tr. 686-87).

Also in September 2012, Plaintiff saw orthopedic physician Matthew Grothaus, M.D. (Tr. 638). Plaintiff reported an injury in July (hitting his knee cap on the corner of a cement step) leading to left knee pain. *Id.* X-rays indicated a "lucency consistent with a vertical patella fracture, non-displaced", *id.*, and osteoarthritis of the knee joint (Tr. 639). Plaintiff was instructed not to work or kneel, given a brace and pain medication, and instructed to follow up in two to three weeks. *Id.* In early October, Plaintiff reported a 30-40 percent improvement in his pain. (Tr. 642). Dr. Grothaus repeated that Plaintiff should not work, increased the range of motion with his brace, and instructed him to follow up in three to four weeks. *Id.* Later that month, Dr. Grothaus noted Plaintiff was doing well, had increased his motion and overall had "improved tremendously." (Tr. 646). Dr. Grothaus injected lidocaine into Plaintiff's right knee to treat his arthritis. *Id.* A left knee x-ray taken the same day showed no definite fracture or dislocation, but arthritic changes, with an impression of osteoarthritis of the left knee. (Tr. 647).

In November 2012, Plaintiff had "pain on palpation superior border of the knee patella." (Tr. 617). That same month, Dr. Vasi noted 2+ pitting edema up to both knees. (Tr. 690, 693).

In December 2012, Plaintiff saw Michael Koenig, PA-C, for left knee pain and was given an injection. (Tr. 654). Plaintiff reported increased pain four days after the injection. (Tr. 656). Mr. Koenig noted crepitus seen with flexion and extension and an antalgic gate with a varus deformity consistent with his osteoarthritis. *Id.* His diagnosis was left knee osteoarthritis, status post injection, stable. *Id.*

In January 2013 Plaintiff reported to Mr. Koenig a pain level of 8 out of 10. (Tr. 665). Mr. Koenig noted similar physical findings as the previous month and diagnosed left knee endstage osteoarthritis. *Id.* Mr. Koenig and Plaintiff discussed total knee arthroplasty. *Id.*

Plaintiff also reported his knee pain to Dr. Vasi in 2013. Dr. Vasi noted edema and pain with motion or palpation (Tr. 699, 703, 711), arthritis in both knees (worse on the left side) (Tr. 714, 717), crepidation in both knees (sometimes worse on the left side) (Tr. 708, 711), and a positive straight leg raising test on the left side (Tr. 699). Plaintiff also had lower back pain (Tr. 697), and underwent a lumbar spine x-ray in April 2013 which showed degenerative spondylosis and mild scoliosis as well as a "[q]uestionable ossific density at the level of the left transverse process of L1". (Tr. 700).

In June 2013, Plaintiff saw Mr. Koenig who noted similar physical findings as before. (Tr. 671). Plaintiff reported his pain was affecting his quality of life and decided to go through with a left total knee anthroplasty. *Id.*; *see also* Tr. 674.

In September 2013, Plaintiff underwent that surgical procedure with Dr. Grothaus. (Tr. 726-32). At follow up appointments in the weeks following the surgery, Mr. Koenig reported Plaintiff was "doing well" after his surgery (Tr. 733, 738) and should "[c]ontinue aggressive range of motion, conditioning and strengthening exercises with physical therapy" (Tr. 738). An x-ray showed the surgery but was otherwise unremarkable. (Tr. 737). At an appointment a month after the surgery, Plaintiff reported pain in his back from his antalgic gait. (Tr. 742). Mr. Koenig instructed him to continue aggressive physical therapy and the current course of treatment. *Id.*

At Plaintiff's initial physical therapy evaluation in September 2013, physical therapist Lindsey McCann noted Plaintiff reported pain of 5-6 out of 10. (Tr. 746). Plaintiff reported using crutches and was able to go up and down stairs without difficulty. *Id.* He also reported he was doing seated and supine exercises at home once or twice per day. *Id.* Plaintiff had reduced range of motion in his left knee, and 1+ pitting edema in his left leg. (Tr. 747). Plaintiff was given a

home exercise plan. *Id.* Ms. McCann thought Plaintiff's prognosis and rehabilitation potential was "[g]ood, with the patient returning back to work." *Id.*

A physical therapy discharge statement completed in December 2013 indicated Plaintiff's compliance with therapy was "fair" (he attended 11 out of 20 visits, and cancelled 9). (Tr. 745). His therapy was discontinued because he "did not return for further treatment." *Id.* Notes indicated Plaintiff was progressing toward most treatment goals at his last appointment and had "reported being very active" the 2 weeks prior to that (November 2013) appointment. *Id.*

During his visits to Dr. Vasi, Plaintiff reported his left knee surgery. (Tr. 756-58, 760-62). In October, Dr. Vasi noted Plaintiff's left knee incision was healing well, and he had swelling and some edema on the left side. (Tr. 758). In November, Dr. Vasi noted tenderness in Plaintiff's low back, but good range of left knee motion and his straight leg raising test was normal. (Tr. 762).

An x-ray of Plaintiff's lower back in November 2013 showed "mild S-shaped scoliosis", "[m]oderate lateral osteophytes along the concavities", and "mild loss of disc height at most lumbar levels with early anterior osteophyte formation." (Tr. 759).

Plaintiff saw Dr. Vasi in January 2014 after a fall on the ice, twisting his right ankle. (Tr. 770); *see also* Tr. 749-53 (emergency room records showing Plaintiff was diagnosed with a bilateral ankle sprain). Plaintiff had good range of motion in his left knee. (Tr. 772). Dr. Vasi also noted crepidation and arthritis in Plaintiff's right knee, as well as ankle swelling on both sides. *Id.* He diagnosed a sprain of both left and right ankles. *Id.* In February 2014, Dr. Vasi again noted a good range of motion in Plaintiff's left knee, and arthritis in his right knee. (Tr. 775).

*Opinion Evidence*

In July 2012, state agency reviewing physician Olga Pylaeva, M.D., opined Plaintiff could occasionally lift/carry 20 pounds, and frequently lift/carry 10 pounds. (Tr. 86). He could stand and/or walk for four hours in an eight-hour workday and sit for six hours in an eight-hour work day. He could never climb ladders/ropes/scaffolds; occasionally stoop, crouch, crawl, and climb ramps/stairs; and frequently kneel. *Id.* Dr. Pylaeva opined Plaintiff should avoid concentrated exposure to extreme temperatures, humidity, fumes, odors, gases, and poor ventilation due to his "moderate obstructive COPD". *Id.*

In November 2012, occupational therapist Cynthia Wise evaluated Plaintiff's functional capacity. (Tr. 617-24). Plaintiff reported "his exercise might involve walking six blocks for lunch." *Id.*; *see also* Tr. 620 ("He states he walks 6 blocks for lunch, having to stop, lean against a tree to rest frequently every 2, 3 minutes as tested today."). He also reported using a BiPAP machine at night. *Id.* In the evaluation, Ms. Wise stated Plaintiff put forth good effort and did not appear to be magnifying his symptoms. (Tr. 617); *see also* Tr. 621, 623. Ms. Wise's evaluation revealed Plaintiff developed shortness of breath when lifting ("[l]ift and place was done reaching from ankle to knuckle level 10 pounds as tolerated up to 4 trial[s] with shortness of breath") and she opined "[a]ny lifting and placing could be done only on an occasional intermittent basis, 2-4 lifts per hour without carrying." (Tr. 621). Plaintiff's fine motor skills were also poor. (Tr. 622). Plaintiff was able to walk for three minutes and twenty-four seconds at a "slow casual pace" and, on a second trial, two minutes and 42 seconds. *Id.* Each time, he had to stop to regain his breath for 1-2 minutes. *Id.* Ms. Wise opined Plaintiff had "limited endurance because of his [COPD] causing him short of breath with minimal activity, walking, standing, climbing, and working overheard." *Id.*

Ms. Wise concluded Plaintiff could: 1) lift and carry 10 pounds on an occasional basis (due to knee pain, back pain, and shortness of breath); 2) lift from knuckle level to shoulder level 38 pounds "as tolerated with good body mechanics"; 3) not back twist, reach overhead, crawl, or climb ladders or stairs ("He needs a hand rail and he goes at a slow pace with the shortness of breath at one flight and knee pain."); 4) walk two and a half minutes before needing to rest due to shortness of breath; 5) stand for 45 minutes; and 6) sit for 45 minutes to one hour. (Tr. 618). She also opined he needed to work in an environment free of particles due to COPD and asthma. *Id.*

Ms. Wise indicated Plaintiff could not sustain competitive employment due "the severity of the COPD and asthma causing shortness of breath." (Tr. 619). She did state, however, he could complete the tasks required of sedentary/light work if his knee pain resolved and "with a rest period allowed at any time when shortness of breath occurs." *Id.*

In January 2013, state agency physician Maureen Gallagher, D.O., M.P.H., reviewed Plaintiff's records and reached the same conclusions as Dr. Pylaeva, but added a limitation to occasional kneeling. (Tr. 101-02).

In March 2014, Dr. Vasi completed a medical source statement. (Tr. 828). The medical source statement included a copy of Ms. Wise's Functional Capacity Assessment with a box to check indicating whether that report was a "fair assessment" of Plaintiff's functional capacity at the current time, and at the time of the evaluation. *Id.* Dr. Vasi checked the "yes" box. *Id.* A second question asked Dr. Vasi to indicate "the date you first prescribed Oxygen" and to indicate "whether [Plaintiff] needs to use the Oxygen during the day and/or if he needs to port his Oxygen with him whenever he is out." *Id.* Dr. Vasi responded: "Uses O2 continuously during night and during day time if necessary. May need portable oxygen." *Id.*

11

***VE Testimony and ALJ Decision***

At the April 2014 hearing, the ALJ asked the VE to assume a person with Plaintiff's age, educational background, work experience and the ability to do light work, limited to: 1) occasional climbing stairs, balancing, stooping, kneeling, crouching, and crawling; 2) no climbing ladders; and 3) no temperature extremes; and 4) no pulmonary irritants; and 5) no more than occasional public contact in person or by telephone (due to a voice issue, not a mental impairment). (Tr. 66-67). The VE testified that such a person could not perform past work, but could perform the jobs of packer and cleaner. (Tr. 68).

In his second hypothetical, the ALJ asked the VE to assume the same limitations, except limiting the person to sedentary work. (Tr. 68-69). The VE responded that such a person could perform the jobs of assembler and packer.

In a third hypothetical, the ALJ asked the VE to assume the same limitations, but that the individual would be off task a significant portion of the day due to things like fatigue or needing to take an extra break. (Tr. 69-70). The VE testified that such a person would not be able to perform the jobs listed or any other jobs. (Tr. 70). He testified that based on his personal experience, being off task 20 percent or more of the work day would preclude jobs. *Id.*

Plaintiff's counsel then asked the VE to consider a person who needs to take a break for fifteen minutes every two hours. (Tr. 72). The VE testified that such a break is "the standard break period" and that he did not think it would affect the ability to perform the work he previously listed. *Id.* However, if the individual needed to elevate their legs not necessarily during break time, that would preclude jobs. (Tr. 73).

Plaintiff's counsel also inquired whether the use of portable oxygen would be allowed in the work place. (Tr. 73).

Q       Okay. And would the use of portable oxygen be allowed on the work place or would have to be accommodated in a break?

A       That's not typically accommodated in any of the jobs. So it would be something that would need to be worked out with the employer, but in my experience it's easy to do that with employers only the sedentary jobs. It's the light level jobs would be more difficult because there's more moving around and people active on the floor. So that would probably be a significant issue.

Q       Okay. But would it still require an accommodation from the employer?

A       Yes, ma'am.

*Id.*

In a written decision dated August 18, 2014, the ALJ found Plaintiff: 1) had not engaged in substantial gainful activity since the application date; 2) had severe impairments of COPD, osteoarthritis left knee status post-left total knee arthroplasty, obesity, and polypoid corditis status post excision of polyps; 3) and did not have an impairment or combination of impairments that meets or medically equals the severity of the listings. (Tr. 21-22). The ALJ concluded Plaintiff retained the residual functional capacity to perform light work as defined in 20 C.F.R. § 416.967(b) except that he:

> [c]an only occasionally climb stairs, balance, stoop, kneel, crouch and crawl; cannot climb ladders or similar devices; cannot work in exposure to high concentrations of dust, fumes, gases and other pulmonary irritants; cannot work in temperature extremes; cannot work in exposure to excessive humidity; and cannot do tasks requiring more than occasional public contact.

(Tr. 23). Based on the VE's testimony, the ALJ then found Plaintiff was not disabled. (Tr. 28).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in

the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1.    Was claimant engaged in a substantial gainful activity?

2.    Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.    Does the severe impairment meet one of the listed impairments?

4.    What is claimant's residual functional capacity and can claimant perform past relevant work?

14

5. Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff alleges the ALJ erred in two regards: 1) in his analysis of treating physician opinion; and 2) in his analysis of Plaintiff's need for oxygen. The Commissioner responds that the ALJ did not err and the decision is supported by substantial evidence.

### *Treating Physician*

Plaintiff's first argument implicates the well-known treating physician rule. Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

A treating physician's opinion is given "controlling weight" if it is supported by (1) medically acceptable clinical and laboratory diagnostic techniques; and (2) is not inconsistent with other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004). The requirement to give controlling weight to a treating source is presumptive; if the ALJ decides not to do so, he must provide evidentiary support for such a finding. *Id.* at 546; *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 376-77 (6th Cir. 2013). When the physician's medical opinion is not granted controlling weight, the ALJ must give "good reasons" for the weight given to the opinion. *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). "Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight." *Wilson,* 378 F.3d at 544.

When determining weight and articulating good reasons, the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin*., 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, he is not required to enter into an in-depth or "exhaustive factor-by-factor analysis" to satisfy the requirement. *See Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011); *Allen v. Comm'r of Soc. Sec*., 561 F.3d 646, 651 (6th Cir. 2009). The Sixth Circuit has held that an ALJ may also give "good reasons" by challenging the supportability and consistency of the treating physician's opinion in an "indirect but clear way", *Brock v. Comm'r of Soc. Sec.*, 368 F. App'x 622, 625 (6th Cir. 2010), or "implicitly provid[ing] sufficient reasons for not

16

giving those opinions controlling weight, and indeed for giving them little to no weight overall", *Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 472 (6th Cir. 2006). The Sixth Circuit has made clear that a court should "not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion." *Cole v. Astrue*, 661 F.3d 931, 939 (6th Cir. 2011) (internal quotation and citation omitted).

When an ALJ determines a treating physician's opinion is not entitled to controlling weight, he must provide support to refute either the opinion's objective basis or its consistency with other record evidence. *Gayheart*, 710 F.3d at 376-77. Conclusory statements in this regard, however, are not sufficient. *See Rogers*, 486 F.3d at 245-46 (finding an ALJ failed to give "good reasons" for rejecting the limitations contained in a treating source's opinion where the ALJ merely stated, without explanation, that the evidence of record did not support the severity of said limitations); *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 552 (6th Cir. 2010) ("Put simply, it is not enough to dismiss a treating physician's opinion as 'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick."); *Fuston v. Comm'r of Soc. Sec.*, 2012 WL 1413097, *7-8 (S.D. Ohio) (finding ALJ deprived the court of meaningful review where the ALJ discarded a treating physician's opinion without identifying any contradictory evidence or explaining which findings were unsupported); *see also Blackburn v. Colvin,* 2013 WL 3967282 at * 7 (N.D. Ohio) (an ALJ's recitation of the medical evidence "does not cure the failure to offer any meaningful analysis as to why the opinions of treating physicians were rejected"); *Sacks v. Colvin*, 2016 WL 1085381 at * 5 (S.D. Ohio) ("[A]lthough the ALJ made a general statement about inconsistencies between Dr. Bhatia's opinions and the 'medical evidence of record,' it was just that—a general statement devoid of any specific

reference to any portion of the medical evidence. Such conclusory statements do not provide the claimant with any ability to understand their content, nor do they provide a reviewing court with the ability to decide if the ALJ correctly or incorrectly assessed those claimed inconsistencies.").

Here, there is no dispute that Dr. Vasi is Plaintiff's treating physician. The opinion at issue is Dr. Vasi's opinion that the functional capacity evaluation performed by occupational therapist Ms. Wise was a "fair assessment" of Plaintiff's abilities both at the time of the evaluation (November 2012) and at the time Dr. Vasi reviewed it (March 2014). *See* Tr. 828; Tr. 61724. In evaluating this opinion evidence, the ALJ explained:

> Significant weight is given to the opinion of occupational therapist, Cynthia Wise, insofar as she concluded that the claimant is capable of light work in terms of lifting and carrying, but less weight is given insofar as she concluded that the claimant is limited to sedentary/light work in sitting, standing, and walking in combination with a rest period allowed at any time when shortness of breath occurs. This is out of proportion to the type and degree and treatment needed and the findings made upon examination. (Exhibit 13F [Tr. 617-24]). Little weight given to Zohar Vasi, M.D., insofar as she later electronically signed and confirmed the report authored by Ms. Wise as it suggests that the claimant may be limited to less than light work in some exertional activities. (Exhibits 13F, p.6 [Tr. 622] and 26F [Tr. 828]). Little weight is further given to Ms. Wise's conclusion that the claimant does not have the functional capacity for competitive employment at this time as the ultimate question of disability is reserved to the Commissioner of the Social Security Administration. 20 CFR 416.927. Less weight is also given to the opinion of Dr. Vasi to the extent that she adopted this portion of Ms. Wise's report. (Exhibit 26F [Tr. 828]). Furthermore, this is inconsistent with Dr. Vasi's own treatment notes, which do not suggest that the claimant is restricted to sedentary work. Moreover, Ms. Wise is not an acceptable medical source.

(Tr. 26).[2]

---

2. The Commissioner is correct that the regulations reserve the ultimate decision regarding disability to the Commissioner. 20 C.F.R. § 404.1527(e)(1); *see also* 20 C.F.R. § 404.1527(e)(3) (no "special significance" given to opinions about disability, even those by treating physician); *Brock*, 368 F. App'x at 625. Thus, the ALJ was justified in rejecting Ms. Wise's conclusion (and Dr. Vasi's adoption of that conclusion) that Plaintiff did not have the capacity for competitive employment. (Tr. 26) (citing Tr. 619).

First, the ALJ's starting point—that he gave Ms. Wise's opinion significant weight to the extent she concluded that Plaintiff could perform the lifting and carrying requirements of light work, is seemingly incorrect. While Ms. Wise opined Plaintiff could lift or carry ten pounds on an occasional basis (Tr. 618), "light work" by definition requires lifting and carrying up to 20 and lifting and carrying 10 pounds frequently. 20 C.F.R. § 416.967(b). Although Ms. Wise did not define "occasional" she also noted that "[a]ny lifting and placing could be done only on an occasional intermittent basis, 2-4 lifts per hour." (Tr. 621).

Second, although the ALJ asserts that Ms. Wise's finding that Plaintiff "is limited to sedentary/light work in sitting, standing, and walking in combination with a rest period allowed at any time when shortness of breath occurs" is "out of proportion" to the "findings made upon examination". (Tr. 26), it is unclear which findings to which he is referring. Ms. Wise noted that Plaintiff became short of breath after carrying an eleven pound carton and ten pound crate for one minute. (Tr. 621). She also noted he was short of breath after two carries of 31 pounds and 28 pounds, and after lifting and placing ten pounds from ankle to knuckle level four times. *Id.* Light work requires lifting and carrying ten pounds frequently (2/3 of the workday), and up to 20 pounds. 20 C.F.R. § 416.967(b); SSR 83-1-, 1983 WL 31251. While the ALJ cites generally to Ms. Wise's functional capacity statement for his "out of proportion" statement, he does not identify any particular findings to support this statement. *See* Tr. 26 (citing Ms. Wise's evaluation as a whole).

In essence, the ALJ states that he rejects Dr. Vasi's opinion (adopting Dr. Wise's opinion) insofar as it supports his RFC determination, and adopts that opinion insofar as it does not support his RFC determination. But this reasoning is circular, without identifying any particular inconsistencies between Dr. Vasi's treatment notes and the functional capacity

evaluation. There may well be good reasons for discounting this opinion, but the ALJ here did not provide them and it is not the Court's (nor the Commissioner's) place to supply them at this juncture. *See Simpson v. Comm'r of Soc. Sec.*, 244 F. App'x 181, 192 (6th Cir. 2009) (Court cannot engage in post hoc rationalizations). Conclusory statements such as these are insufficient to provide the "good reasons" necessary for discounting a treating physician's opinion. *See Rogers*, 486 F.3d at 245-46; *Friend*, 375 F. App'x at 552; *Fuston*, 2012 WL 1413097, at *7-8.

Although Defendant attempts to save the ALJ's determination by pointing to the ALJ's consideration of Plaintiff's improvement following knee surgery and reference to his only using his CPAP machine for four hours per night, the ALJ makes no effort to connect those reasons to the rejection of the opinion.[3] Additionally, Dr. Vasi's general statement that Plaintiff was "doing well" following knee surgery does not speak to Plaintiff's breathing difficulties which Ms. Wise noted repeatedly.[4] Finally, the ALJ's reliance on the state agency physicians' opinions does not save the decision because it is not relevant to the analysis. This is so because whether the RFC is supported by substantial evidence, is a *separate* question from whether the ALJ complied with the regulations regarding treating physician opinions. *See Gayheart*, 710 F.3d at 377 ("Surely the conflicting substantial evidence must consist of more than the medical opinions of the nontreating and nonexamining doctors.").

---

3. The undersigned also notes that the ALJ stated it was "frequently noted that [Plaintiff] uses his CPAP for only a few hours at night". (Tr. 24) (citing Tr. 784). The ALJ, however, only identifies ("for example") this single record for that proposition and the Commissioner has not identified any other record to support this statement. Additionally, the Commissioner repeats this overstatement, saying that Plaintiff "testified that he only needed it for a few hours at night." (Doc. 15, at 9). For this proposition, the Commissioner does not cite any of Plaintiff's testimony, but rather cites: 1) the ALJ's decision; 2) the record cited in the ALJ's decision; and 3) Dr. Vasi's opinion (which states "uses O2 continuously during night"). These citations do not support the statement that Plaintiff "testified that he only needed" oxygen "for a few hours at night."

4. Dr. Vasi also repeatedly noted decreased breath sounds or wheezing. *See* Tr. 685, 690, 692, 696, 703, 705, 708, 711, 714, 717, 720, 724, 758, 762, 766, 771, 775.

Although an ALJ need not describe every limitation in a treating source's opinion, he must provide enough analysis so that this Court can perform a meaningful review. While the ALJ here did discuss much of the evidence in the record, this does not cure the failure to offer any meaningful analysis as to why Dr. Vasi's opinion was rejected. While the ALJ concluded that this opinion was inconsistent with the evidence, he does not offer any *explanation* as to what inconsistencies he found.

In conclusion, the ALJ's general conclusory statements—without reference to the record—that Dr. Vasi's opinion (adopting Ms. Wise's opinion) was 1) "out of proportion to the type and degree of treatment needed and the findings made upon examination"; 2) given "little weight" because "it suggests that the claimant may be limited to less than light work in some exertional activities"; and 3) is "inconsistent with Dr. Vasi's own treatment notes, which do not suggest that [Plaintiff] is restricted to sedentary work" (Tr. 26) are not enough to satisfy the reasons-giving requirement of the regulations. They are not "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Wilson*, 378 F.3d at 544. There may well be good reasons for discounting this opinion, but it is the ALJ's duty, not this Court's, to provide them. Thus, the Court finds remand is required for the ALJ to properly address Dr. Vasi's opinion.

### *Oxygen Usage*

Plaintiff's second contention is that the ALJ erred in addressing Plaintiff's need for oxygen. The Commissioner responds that the ALJ reasonably considered Plaintiff's oxygen usage, and "even if Plaintiff had to use his portable oxygen during the day at the levels to which he testified [approximately 10 minutes twice per day], he would be able to perform competitive

employment" because the VE testified that the standard break period is 15 minutes for every two hours of work. (Doc. 15, at 13).

The ALJ here did not include Plaintiff's use of oxygen in his final RFC determination. He did, however, address the testimony from the VE regarding Plaintiff's use of oxygen:

> The claimant's representative asked the vocational expert whether the jobs identified could be performed with the use of oxygen. However, it appears that the claimant uses oxygen mainly at night. There is nothing in the medical records to suggest that the claimant must use it during all hours of the day. In any event he could do the sedentary jobs even with oxygen according to the vocational expert testimony.

(Tr. 23). Thus, the ALJ seemingly recognized Plaintiff's need for oxygen, but found no need to include it in the RFC (finding it in essence harmless) because of the VE testimony that the use of portable oxygen is typically accommodated by employers in sedentary jobs. However, the VE testified that the use of oxygen in any job—light or sedentary—would require an employer accommodation. *See* Tr. 73. As Plaintiff notes, the Supreme Court has stated that when determining disability, the Commissioner does not take the possibility of "reasonable accommodations" under the Americans with Disabilities Act into consideration. *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 803 (1999); *see also Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999) ("[A] vocational expert should not base his determination of the availability of jobs on the assumption that the ADA requires an employer to accommodate an individual's disability."); *Griffeth v. Wal-Mart Stores, Inc.*, 135 F.3d 376, 380 (6th Cir. 1998) ("the Social Security Administration does not consider whether an individual is able to work with reasonable accommodation in determining entitlement to disability benefits"). Thus, the ALJ is not entitled to consider potential accommodation by employers in determining the availability of jobs in the national economy that a Plaintiff can perform. *See, e.g.*, *Titus v. Astrue*, 2012 WL 3113165, at *12 (N.D. Ohio), report and recommendation adopted 2012 WL 3113160 (N.D. Ohio).

Although Defendant is correct that there was no evidence that Plaintiff needed the oxygen at all times, the ALJ cited, without rejecting, Dr. Vasi's March 2014 opinion that Plaintiff uses oxygen "during the day if necessary and may need portable oxygen." (Tr. 25) (citing Tr. 828). Because remand is already required to address the treating physician error, and because the ALJ's decision on this point is unclear as to whether he determined that: 1) oxygen was not required, or 2) oxygen would be accommodated in the workplace, the ALJ should also more clearly explain his determination on remand.[5]

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying SSI benefits is not supported by substantial evidence. Accordingly, the decision of the Commissioner is reversed and this case is remanded for further proceedings consistent with this opinion pursuant to sentence four of 42 U.S.C. § 405(g).

 s/James R. Knepp II
United States Magistrate Judge

---

5. The Commissioner seemingly argues harmless error in contending Plaintiff's oxygen usage could fit into regularly defined break periods. This is at odds, however, with Plaintiff's testimony that he needs the oxygen when he becomes short of breath due to overexertion, which is not something one could schedule to fit into a break period. *See* Tr. 52-53. Again, the ALJ can address this issue on remand.